## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**IN RE: DAVOL, INC./C.R. BARD, INC., POLYPROPYLENE HERNIA MESH PRODUCTS LIABILITY LITIGATION**

**Case No. 2:18-md-2846**

**JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Kimberly A. Jolson**

**This document relates to:**
***Bryan v. C.R. Bard, Inc., et al.***
**Case No. 2:18-cv-1440**

## DISCOVERY ORDER

Before the Court is Plaintiff's Motion to Extend Case-Specific Fact Discovery to Permit Two Limited, Case-Specific Depositions (ECF Nos. 42, 54). Defendants oppose Plaintiff's Motion. (ECF Nos. 44, 55.) For the reasons that follow, Plaintiff's Motion is **DENIED**.

### I.      Background

Plaintiff's case is the fourth bellwether trial selected from thousands of cases in this multidistrict litigation ("MDL") against Defendants. The Judicial Panel on Multidistrict Litigation described the cases in this MDL as "shar[ing] common factual questions arising out of allegations that defects in defendants' polypropylene hernia mesh products can lead to complications when implanted in patients, including adhesions, damage to organs, inflammatory and allergic responses, foreign body rejection, migration of the mesh, and infections." (No. 2:18-md-02846, ECF No. 1 at PageID #1–2.)

The relevant facts here are that in 2012, Plaintiff underwent an inguinal hernia repair with a 3DMax hernia mesh device, a product manufactured by Defendants. (ECF No. 1 at PageID #3.) In 2017, Plaintiff underwent a surgical removal of the 3DMax. (*Id.*) The crux of Plaintiff's claims is that Defendants knew of certain risks presented by the 3DMax but marketed and sold the device

1

despite these risks and without appropriate warnings, causing Plaintiff's injuries.  Plaintiff filed a motion seeking to depose two of Defendants' sales representatives, Austin Knipp and Brad Prouty, after the close of fact discovery.  (ECF No. 42.)  In their response Defendants pointed out that, as was noted on their Defendants' Fact Sheet ("DFS") which they served to Plaintiff in 2019, Knipp and Prouty were not employed with Defendants until years after Plaintiff's implant surgery.  (ECF No. 44 at PageID #233.)  Plaintiff filed an amended motion adopting his prior arguments but swapping Knipp and Prouty out for two different former employees, Andrew O'Keefe and Matt Fenton.  (ECF No. 54.)

## II.     Legal Standard

A scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  Factors that should be considered include:

(1)  When the moving party learned of the issue that is the subject of discovery;

(2)  How the discovery would affect the [case];

(3)  The length of the discovery period;

(4)  Whether the moving party was dilatory; and

(5)  Whether the adverse party was responsive to prior discovery requests.

*Dowling v. Cleveland Clinic Found.*, 593 F.3d 472, 478 (6th Cir. 2010).  "The overarching inquiry in these overlapping factors is whether the moving party was diligent in pursuing discovery."  *Id.* A court should also consider any potential prejudice to the opposing party.  *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005) (citing *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir.2002)).

## III.     Analysis

### A.  When Plaintiff Learned of the Issue

The parties frame this factor differently.  Plaintiff appears to believe that the factor refers not to when Plaintiff learned of the employees' identities, but to when Plaintiff sought the

depositions.  Plaintiff claims he is "raising this issue immediately upon learning about the Defendants' refusal to agree to these requested depositions and after the required meet and confer." (ECF No. 42 at PageID #208.)  However, Defendants point out that Plaintiff learned of the identity of the employees over four years ago.  (ECF No. 44 at PageID #234.)  The second page of the DFS, which was served on April 25, 2019, lists O'Keefe and other sales representatives and their dates of employment.  (ECF No. 44-1 at PageID #241.)  The DFS does not mention Fenton, who Plaintiff never alleges had contact with Dr. Caban but who supervised O'Keefe and a now-deceased former sales representative, Bruce Speers.  (*Id.*)  The Court agrees with Defendants' interpretation of this factor.  Plaintiff has known the names and dates of employment of four sales representatives since 2019, and did not seek any depositions until November 22, 2023, approximately one month after the close of fact discovery.  This factor weighs in favor of denying Plaintiff's Motion.

### B.  How Discovery Would Affect the Case

Plaintiff argues that the depositions of the sales representatives "are critical for obtaining information regarding the messages and safety information that w[ere] shared (or not shared) with Plaintiff's implanting physician," and the depositions are therefore critical to his "failure to warn and other claims."  (ECF No. 42 at PageID #208.)

In his amended Motion seeking to depose O'Keefe and Fenton, Plaintiff claims that "the names of the deposition witnesses to testify on this important topic are fungible" and although the names of the witnesses have changed, the substance of his request has not.  (ECF No. 54 at PageID #270.)  The Court disagrees.  Unlike the sales representatives Plaintiff initially sought to depose, Dr. Caban was not questioned about and did not himself mention O'Keefe nor Fenton during his deposition.  Fenton was a supervisor and Plaintiff never contends that he interacted with

3

Dr. Caban.  In seeking to depose Fenton, Plaintiff points out that Fenton supervised now-deceased sales representative Speers "who detailed Dr. Caban from 1999 to 2011."  (ECF No. 54 at PageID #268.)  However, in his deposition Dr. Caban specifically testified that he *did not* recall the name Bruce Speers.  (ECF No. 42-1 at PageID #214–15, 21:24–22:2.)  And "[w]hile Dr. Caban did testify that certain reps contacted him prior to 2012, neither [O'Keefe] nor [Fenton] was identified as one of those reps."  (ECF No. 44 at PageID #234.)

Plaintiff claims the depositions are important so he can learn "the number of times that a sales representative sat in on a 3DMax surgery prior to [Plaintiff]'s implant."  (ECF No. 54 at PageID #270.)  However, Plaintiff does not explain how this would be relevant to his claims. Plaintiff claims that these depositions would also cover "interactions and discussions related to the 3DMax; what brochures and marketing materials [Plaintiff's] treating physicians received; whether the sales representatives were involved in any training sessions with [Plaintiff's] physicians; as well as the medical literature the sales-related witnesses distributed or referenced during conversations with [Plaintiff's] treating physicians."  (*Id.* at PageID #270–71.)  However, Dr. Caban testified that he based his decisions on "[his] own training, not on what any rep will say. . . . So whatever influence the rep has, it has absolutely zero influence in [his] clinical decisions." (ECF No. 55-1 at PageID #296, 26:12–20.)  And while sales representatives would discuss with him the benefits of using their products, he "d[id not] use the product just because they say that" and "d[id not] base [his] practice on what a rep tells [him] or what the company tells [him]."  (*Id.* at PageID #295, 24:4–12; #310 at 85:14–15.)

Plaintiff claims that Dr. Caban spoke with Defendants' sales representatives once a month from 2006 until the time of his deposition, therefore these witnesses will have "extremely probative information about what was provided to Dr. Caban and what was discussed with him for the entire

4

time he was practicing." (ECF No. 54 at PageID #269.) However, Dr. Caban did not testify that he spoke that frequently with *Defendants'* sales representatives specifically. He testified that he spoke with "sales reps from device manufacturers . . . [n]ot very often[,] [o]nce a month maybe." (ECF No. 54-1 at PageID #276, 21:3–9.)

Considering that Dr. Caban never testified that he discussed the 3DMax with O'Keefe or Fenton, and specifically said he did not remember Speers, it is hard to see how the requested depositions would be helpful or relevant to this case. This factor also weighs in favor of denying Plaintiff's Motion.

## C. The Length of the Discovery Period

Plaintiff argues that "given Defendants' motion to remove *Bryan* as a Bellwether, the actual time to conduct the additional case-specific depositions has been relatively short." (ECF No. 42 at PageID 208–09.) The parties both acknowledge that this case was not originally scheduled as a bellwether case and was selected as a replacement for *Miller v. C.R. Bard, Inc., et al.*, Case No. 18-cv-1443. On August 17, 2022, more than one year before Plaintiff sought to depose the sales representatives, the Court issued a Case Management Order identifying *Bryan* as the fourth bellwether case and setting a trial date. (Case No. 18-md-2846, CMO No. 35, ECF No. 656.) Defendants later filed a motion challenging the representativeness of this case as a bellwether. (ECF No. 29.) However, that motion was not filed until May 24, 2023, nine months after this case was initially scheduled for trial. (*Id.*) Additionally, the Court ruled on that motion on June 20, 2023, over five months before Plaintiff requested the depositions. (Case No. 18-md-2846, ECF No. 763.) As Defendants point out in their response, Plaintiff offers no showing of diligence or an explanation as to why, instead of seeking the depositions between August 17, 2022 and October 23, 2023, he waited until a month after the close of fact discovery to request the deposition of sales

representatives who were disclosed 2019.  Accordingly, this factor weighs in favor of denying Plaintiff's Motion.

### D.  Whether Plaintiff was Dilatory

Plaintiff claims that "the parties agreed that each side would be permitted five additional case-specific depositions per side" and points to an email exchange with defense counsel.  (ECF No. 42 at PageID #206.)  The email does in fact show such an agreement between the parties; however, that agreement was reached on August 7, 2023, two and a half months prior to the close of fact discovery.  (ECF No. 42-2.)  Plaintiff also claims that he "believed, and intended for," the parties to "modify *all* discovery cut-offs to the deadline for expert discovery (January 10, 2024)" (ECF No. 42 at PageID #206 (emphasis in original)), instead of the fact discovery deadline of October 23, 2023 that was included in the scheduling order agreed upon by the parties and jointly submitted to the Court (ECF No. 39 at PageID #183).  Defendants disagree and claim "[t]he goal was always to ensure that *fact discovery* was closed so the parties could focus on expert discovery and the extensive pretrial work that lay ahead."  (ECF No. 44 at PageID #236 (emphasis in original).)

Plaintiff argues that his conduct was not dilatory because he "raised this issue immediately upon learning that Defendants were not going to abide by the parties' agreement to permit five additional fact discovery depositions each."  (ECF No. 42 at PageID #209.)  However, as the Court noted above, Plaintiff offers no explanation as to why he did not seek the depositions in the fourteen months between when this case was initially set for trial and the close of fact discovery. The scheduling order does contemplate potential additional depositions "given the need for updated medical records as of the date of [the scheduling order]."  (ECF No. 39 at PageID #183.) However, these depositions have nothing to do with any delays in receiving medical records or

changes to Plaintiff's medical condition.  The sales representatives were identified over four years ago and are not involved in Plaintiff's medical treatment.

Plaintiff makes much of two of Defendants' depositions that fell after the fact discovery deadline: a deposition of Dr. Al-Mansour, one of Plaintiff's treating physicians, on October 30, 2023; and a supplemental deposition of Plaintiff on December 8, 2023.  (ECF No. 42 at PageID #207.)  However, those depositions are not comparable to the situation at hand.  As for Dr. Al-Mansour's deposition, Defendants sought to schedule the deposition prior to the close of fact discovery but "the only date the doctor offered was October 30, 2023, *to which both parties agreed*."  (ECF No. 44 at PageID #233 (emphasis in original).)  Additionally, the scheduling order specifically contemplates this situation "given the need for updated medical records."  (ECF No. 39 at PageID #183.)  And as for Plaintiff's supplemental deposition, he is the one who offered the deposition dates, apparently to accommodate an in-person deposition after the completion of the third bellwether trial "due to [Plaintiff] not having Zoom capabilities to appear remotely."  (ECF No. 42 at PageID #206.)  That is hardly the same as Plaintiff's delay in seeking depositions of sales representatives he has known of for several years.  This factor weighs in favor of denying Plaintiff's Motion.

### E.  Whether Defendants Were Responsive to Prior Discovery Requests

Plaintiff claims that "[t]o the extent this factor is applicable here, it favors [Plaintiff] because the Defendants are not abiding by the parties' agreement related to the five additional depositions."  (ECF No. 42 at PageID #209.)  The Court has already addressed the agreement above, and this factor relates to *prior* discovery requests, not the discovery request at issue in this Motion.  Additionally, Plaintiff accuses Defendants of not having properly supplemented their DFS because one of the sales representatives was listed as presently employed, not as a former

employee.  (*Id.*)  This *non sequitur* does not show a failure of Defendants to comply with prior discovery requests.  Accordingly, all five factors weigh in favor of denying Plaintiff's Motion.

### F. Potential Prejudice to Defendants

In addition to the five factors above, the Court should consider any potential prejudice to Defendants that would result from granting the Motion.  *Andretti*, 426 F.3d at 830 (internal citation omitted).  Plaintiff again points to the agreement between the parties regarding five additional depositions and argues that taking the depositions remotely and limiting them to two hours each would help to alleviate any burden to Defendants.  (ECF No. 42 at PageID #209.)  Defendants respond that the prejudice would be significant and unjustified.  They point to the imminent deadlines regarding expert discovery, expert depositions, and dispositive and *Daubert* motions.  (ECF No. 44 at PageID #235–36.)  Additionally, Defendants point out that both O'Keefe and Fenton are former employees (ECF No. 55 at PageID #281) whose schedules they have no control over, and "Plaintiff's offer to limit the depositions to two hours is of little help because [Defendants] would still need to locate the former employees, review their approximately 8,000 documents, and prepare for and defend the depositions."  (ECF No. 44 at PageID #236.)  The Court agrees that, given the lack of relevance, the burden to Defendants would be significant and unjustified.

### IV.    Conclusion

For the reasons set forth above, Plaintiff's Motion to Extend Case-Specific Fact Discovery to Permit Two Limited, Case-Specific Depositions (ECF Nos. 42, 54) is **DENIED**.

**IT IS SO ORDERED.**


**1/10/2024**                          **s/Edmund A. Sargus, Jr.**
**DATE**                                 **EDMUND A. SARGUS, JR.**
                                                **UNITED STATES DISTRICT JUDGE**